IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TITUS HENDERSON,

        Plaintiff,

    v.                              Case No. 18-CV-555

DEAN STEINSBERG,
ET AL.,

        Defendants.

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Titus Henderson is a pro se inmate currently housed at Green Bay Correctional Institution. Henderson was granted leave to proceed on Fourteenth Amendment Equal Protection claims relating to parole and to the Department of Corrections' use of COMPAS. (Dkt. 13.) COMPAS, or "Correctional Offender Management Profiling for Alternative Sanctions," is a risk assessment tool used by Corrections. (*See* Dkt. 1: 3 ¶ 2.) The claims should be dismissed because they fail as a matter of law for the reasons described below.[1]

### Statement of the Case

Defendants incorporate by reference Defendants' Proposed Findings of Fact ("DPFOF") filed herewith.

---

[1] This brief will only discuss claims relating to State Defendants as opposed to non-State Defendants Northpointe, Inc., David Wells, and Timothy Brennan.

<u>Henderson's Allegations</u>

Henderson alleges Defendant Jared Hoy knows COMPAS cannot predict whether an inmate will commit a crime after parole release. (Dkt. 1:5 ¶ 8.) He alleges Defendants Dean Stensberg[2], and Daniel Gabler used COMPAS at parole hearings despite the program's racial bias. (Dkt. 1: 3, ¶ 3; 4:  ¶¶ 5, 15, 6: ¶ 11.) He alleges Defendant Steven Landreman denied his parole in 2015, relying on COMPAS.  (Dkt. 1: 9 ¶¶ 28, 33.) And Henderson alleges Defendant Colleen Frey refused to process Henderson's "parole plan," calling him a racial slur. (Dkt. 1: 9 ¶¶ 27, 32.)

<u>Hoy's Involvement with COMPAS</u>

At the times relevant to this case, Hoy held the position of Policy Initiatives Advisor, working as the Department of Corrections ("Corrections") Reentry Project Manager. He held this position from 2011 until 2017. (DPFOF ¶ 1.)

In his capacity as the Reentry Project Manager, Hoy was responsible for providing policy development and implementation of offender reentry initiatives in order to promote public safety and offender success from admission into custody through their discharge from community supervision. Hoy developed and delivered large-scale complex reentry projects and developed technical policy, procedures and reports on reentry issues affecting Corrections, including new rules and the implementation of new programs. Hoy served as Corrections' representative and liaison with other state, local and community-based agencies as it related to reentry

---

[2] The correct spelling is Stensberg, not Steinsberg, as Henderson spelled it. (*See* Dkt. 17:1.)

programming. Hoy also served as the project manager in providing oversight, delegation and direction to Reentry team staff, in coordination with the Reentry Director. (DPFOF ¶ 2.)

During his time as Reentry Project Manager, Hoy was involved in the introduction of COMPAS into Corrections. He was on the selection committee that reviewed proposals from various risk assessment programs. Ultimately, Corrections chose COMPAS as Northpointe was the most responsive bidder. (DPFOF ¶ 3.)

COMPAS met all of the identified needs for a risk assessment tool, including:

- Validated risk assessment tool that predicted both general and violent risk to reoffend;
- Comprehensive needs assessment;
- Risk assessments for various decision points in the correctional system (intake, release, etc.);
- Juvenile risk assessment;
- Alternative screenings (i.e. offense-specific assessments or trailer tools);
- Automated;
- Blended case plan that is driven by the assessment; and
- Ability to add various other case management functionality.

(DPFOF ¶ 4.)

COMPAS does not use race as a factor in its proprietary risk assessment calculation. The tool itself does not even know an offender's race. (DPFOF ¶ 5.)

Starting in 2011, Corrections began its pilot program with COMPAS and eventually implemented the use of this program throughout the Division of Community Corrections and Division of Adult Institutions. (DPFOF ¶ 6.)

In August of 2013, Hoy was one of the presenters for a webinar presentation about the Wisconsin Unified Corrections Coalition, for the Justice Information Sharing Practitioners Network. The Wisconsin Unified Corrections Coalition is a

cross-divisional committee that was created to oversee the implementation of COMPAS throughout Corrections. Hoy presented on Wisconsin Corrections' implementation of risk and need assessment across the state. Enterprise application of risk and needs assessment was just emerging as an evidence-based practice and the intent of the webinar was to tell Wisconsin Corrections' "story" as a system that uses risk and need information across many justice jurisdictions. (DPFOF ¶¶ 7-8.)

Hoy talked about the offender lifecycle in the Wisconsin, from the first point of contact in the system (i.e. arrest) all the way through discharge. Hoy discussed how Corrections was working to determine how an offender should ideally move through the Correctional system in Wisconsin, and to maintain consistency with the offender's case management plan throughout the different points. In reference to the Offender Lifecycle diagram shown in the presentation at that time, Hoy stated, "Neal often times refers to this as a giant correctional pinball machine." He meant that the way someone may move through the system is similar to a pinball machine: an offender can move in all different parts and directions of the system from arrest, prison, community supervision, revocation, back to prison, release on parole, or moved into county custody. At every point of the system, Corrections seeks to ensure that the application of the offender's risk assessment and case management plans are consistent and everyone is on the same page, no matter if the offender is still housed within Corrections or if they have moved into a new jurisdiction, such as the county or after care services. (DPFOF ¶ 10.)

When Hoy referred to Neal, he was talking about Neal Goodloe, who was a

Project Manager for Northpointe, Inc. at the time, and also a presenter for the webinar. Hoy worked with Goodloe frequently during the implementation of COMPAS into Wisconsin Corrections. (DPFOF ¶ 11.)

Hoy did not have involvement in signing the contract that Corrections entered into with Northpoint in July of 2010. (DPFOF ¶ 12.)

Hoy has also never been a member of the Parole Commission and does not know which documents or information from COMPAS the Parole Commission may utilize in making decisions. (DPFOF ¶ 13.)

Wisconsin Parole Commission use of COMPAS

The Wisconsin Parole Commission (the "Commission") is an independent commission attached to Corrections for administrative purposes. It implements its statutory responsibilities independently. (DPFOF ¶ 14.)

Landreman was employed by Correction as a Parole Commission Member from October 1, 2001 to September 28, 2019 and Stensberg was employed by Corrections as the Chairman of the Parole Commission from March 22, 2015 to January 7, 2017. (DPFOF ¶¶ 15-16.)

The Commission maintains and utilizes criteria for evaluating prisoner eligibility for parole. Such criteria are publicly available on Corrections' website: https://doc.wi.gov/Pages/AboutDOC/ParoleCommission.aspx. The website states:

> Parole consideration is an entitlement; however, parole is not. Each case is measured on an individual basis and parole consideration is based on the following criteria:
>
> - Reached their Parole Eligibility Date.
> - Served sufficient time for punishment so as not to depreciate the severity of their offending behaviors.

- Maintained positive institutional adjustment.
- Completed assessed program needs with maximum benefit achieved.
- Completed and submitted a workable parole plan, which offers the inmate a realistic opportunity for a stable residence, employment and programming, if needed.
- Reduced his / her level of risk to the public. This can be measured by considering his / her past criminal record, the institutional conduct record, prior probation and parole violations / revocations, security classification history, and if there are any unmet treatment or program's needs.

(DPFOF ¶ 17.)

Henderson was the subject of a Parole Commission Action taken on November 18, 2015 (the "Action"). The purpose of the Action was for the Commission to determine whether Henderson qualified for parole based on the applicable criteria. On that date, the Commission determined that Henderson was not eligible for parole. The general reasons for the Commission's action included determinations that: Henderson had not served sufficient time for his punishment; his institutional conduct was not satisfactory; his program participation was not satisfactory; and though he had developed an adequate plan, it was subject to further verification. The Commission concluded that Henderson's release would involve an unreasonable risk to the public. (DPFOF ¶ 18.)

Gabler was not employed by Corrections as a member of the Parole Commission until March 5, 2017 (serving until January 4, 2019) and, therefore, had no involvement with the November 18, 2015 Action involving Henderson. (DPFOF ¶ 19.)

Corrections licenses the software known as COMPAS from Northpointe Institute for Public Management, Inc. (n/k/a Northpointe, Inc.). COMPAS software can be used as a risk assessment tool to evaluate a prisoner's potential likelihood of

recidivism. The software typically generates a report based on criteria and information input by the end user. (DPFOF ¶ 20.)

On August 1, 2014, Henderson was the subject of a COMPAS risk assessment conducted by Corrections. A report from that assessment was generated (the "COMPAS Report"). Henderson's risk assessment was assigned a unique Case Identifier (613865-1). The COMPAS Report was the most recent report created by the Department for Henderson prior to the Action. (DPFOF ¶ 21.)

The COMPAS Report reflects Overall Risk Potential scores for Henderson. Henderson's Violent Recidivism Risk score was "Low" (1 out of 10), as was his General Recidivism Risk score. (DPFOF ¶ 22.)

The Commission did not utilize or rely on the COMPAS Report (or any other report generated by COMPAS) in connection with the Action. The bases of the Action are identified in the corresponding Action Report and COMPAS is not referred to in the Action Report. (DPFOF ¶ 23.)

Frey's Processing of Henderson's Parole Plan

At the times relevant to this case, Frey was employed by Corrections as a social worker and has been a licensed social worker with the State of Wisconsin since 1993. (DPFOF ¶ 24.)

In her capacity as a social worker, Frey's duties included: assessing and evaluating offenders assigned to her caseload regarding treatment and security needs; formulating case plans and monitoring offender progress; providing counseling services; and referring offenders to institution and community resources upon

transfer or release and the coordination of those services. (DPFOF ¶ 25.)

Henderson was assigned to Frey's caseload from July 1, 2015 until he transferred to another correctional institution on March 29, 2016. (DPFOF ¶ 26.)

Corrections has a process in place for scheduling/preparing an inmate for parole consideration. As a social worker, Frey was responsible for notifying inmates when they were coming up for parole consideration and preparing a statement for consideration by the Parole Commission. (DPFOF ¶ 27.)

In preparation for an inmate's parole hearing, the social worker serves the inmate with a DOC-1204 "Notice of Parole Commission Consideration" form. This form notifies the inmate that he is coming up for parole consideration, tells him what month he is scheduled for his hearing, and details what the Parole Commission will take into consideration when reviewing his case. The social worker then asks the inmate to sign the DOC-1204 form indicating that they have been made aware that they have parole consideration coming up and have had the opportunity to review the factors the Parole Commission will consider. The inmate is given a copy of the DOC-1204. (DPFOF ¶¶ 28-29.)

The social worker also gives the inmate a DOC-745 "Release Plan Information" to complete, and the information they include on their release plan is also taken into consideration by the Parole Commission. This form is the chance for the inmate to inform staff of their plans upon release for obtaining a residence, employment, finances, transportation, health care, treatment services, and other pertinent information. (DPFOF ¶ 30.)

8

When these documents are made available to an inmate, a signature is requested on the DOC-1204 and the DOC-745 is typically left with the inmate so they can spend time completing the plan before returning it to their assigned social worker. A portion of the DOC-745 is for the social worker to submit a statement. As part of the social worker statement, the social worker summarizes the inmate's criminal offenses; behavior and conduct in prison; and treatment needs. Once both documents (DOC-1204 and DOC-745) are completed and signed, they are given to Records Office staff for placement in the inmate's social services file prior to the scheduled parole hearing. Combined, the DOC-1204 and DOC-745 are referred to as the "parole packet." (DPFOF ¶¶ 31-33.)

On October 22, 2015, Frey attempted to serve Henderson with a DOC-1204 notifying him that he was scheduled for parole consideration in November 2015. Frey also attempted to give him the release plan to complete. Henderson chose not to accept these forms. Frey signed the DOC-1204 and noted that "Inmate refused to sign." (DPFOF ¶ 34.)

On October 23, 2015, Frey entered a note in Henderson's file stating:

C. Frey SW RCI/RHU Attempted to serve Inmate with 1204 Notice of Parole. Refused to sign and did not want any paperwork from me until he is given a "parole packet." Did not accept 0745 to complete for parole. SW will submit plan with SW Section complete.

(DPFOF ¶ 35.)

It is the inmate's choice to accept and complete the parole packet forms. Henderson did not clarify what other forms he wanted when he stated that he did not want any paperwork until he received his parole packet. There was no other

information related to parole that Frey could have given him at that time. If Henderson had changed his mind and decided to accept the paperwork, he could have spoken to Frey during her daily rounds on the unit or written an interview/information request to her. (DPFOF ¶¶ 36-38.)

Frey completed the social worker statement portion of Henderson's release plan prior to his parole consideration hearing, noting that he was incarcerated for First Degree Reckless Homicide and three counts of First Degree Recklessly Endangering Safety and Battery by a Prisoner. He received 70 conduct reports, 55 of those for major rule violations, since he was first incarcerated in 1995. Frey also mentioned that his release plans were unknown as he had refused to complete the form. (DPFOF ¶ 39.)

Frey never stated she did not do Henderson's release plan because he was too demanding or told Henderson that COMPAS had already determined he would be denied parole. In her Social Worker Statement on Henderson's release plan, she noted that a COMPAS legacy (questionnaire and risk assessment) was completed by Corrections and he scored low in his risk areas. (DPFOF ¶¶ 40-41.)

Frey never used a racial remark in reference to Henderson or spoke to a psychologist regarding him. (DPFOF ¶¶ 42-43.)

## Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one that, under applicable law, "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. It is the movant's responsibility to inform the court of the basis for the movant's motion and to identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-248.

The non-movant may not rest upon mere allegations or self-serving denials. *Celotex*, 477 U.S. at 324. Likewise, the movant's subjective beliefs are not sufficient to create a genuine issue of material fact and preclude summary judgment. *McMillian v. Svetanoff*, 878 F.2d 186, 191 (7th Cir. 1989). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact" to preclude summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To prevent summary judgment for the defendants here, Henderson must offer "evidence on which the jury could reasonably find" in her favor. *Anderson*, 477 U.S. at 252.

## Argument

Henderson's equal protection claims fail as a matter of law because the undisputed evidence shows COMPAS did not negatively influence his parole review

nor did Defendants Hoy, Stensberg, Gabler or Landreman rely on COMPAS to determine Henderson's parole eligibility. Henderson also cannot show Defendant Frey discriminated against him when Henderson refused to participate in the process of submitting his parole paperwork. Further, Defendants are entitled to summary judgment on the basis of qualified immunity.

## I.   Henderson lacks standing to bring a claim about COMPAS.

Article III of the United States Constitution provides federal courts jurisdiction to adjudicate actual "Cases" and "Controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). Standing is "the irreducible constitutional minimum" that determines which cases and controversies "are of the justiciable sort referred to in Article III." *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir.), *cert. denied,* 139 S. Ct. 126 (2018). (citing *Lujan*, 504 U.S. at 560). Standing implicates the Court's subject matter jurisdiction. *See G & S Holdings LLC v. Continental Cas. Co.,* 697 F.3d 534, 543 (7th Cir.2012). To invoke federal jurisdiction, Henderson must establish the three elements of standing: "(1) that he suffered an injury in fact, (2) that the injury is causally connected to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable judicial decision." *Doe*, 883 F.3d at 975. Henderson bears the burden of proof as to standing. *Kathrein v. City of Evanston, Ill.*, 636 F.3d 906, 914 (7th Cir. 2011).

Henderson's claims related to COMPAS should be dismissed because he cannot establish the second element of standing. He may have suffered an injury by having his parole denied, but the injury has no relationship to the challenged conduct, the

use of COMPAS. As described above, the August 1, 2014 COMPAS Report was the most recent report created by Corrections for Henderson prior to the Action. (DPFOF ¶ 21.) The COMPAS Report reflects Overall Risk Potential scores for Henderson. Henderson's Violent Recidivism Risk score was "Low" (1 out of 10), as was his General Recidivism Risk score. (DPFOF ¶ 22.) Thus, even if the Commission had incorporated the COMPAS Report into its analysis (which it did not), COMPAS did not inflate Henderson's risk rating. Therefore, Henderson does not have standing to bring a claim related to COMPAS's alleged racial bias.

## II.   Hoy and Gabler should be dismissed for lack of personal involvement.

Neither Hoy nor Gabler had sufficient involvement in the underlying activity to liable in this lawsuit. A plaintiff cannot recover under 42 U.S.C. § 1983 without establishing that the defendants were personally involved in the alleged constitutional violation. *Knight v. Wiseman,* 590 F.3d 458, 462-63 (7th Cir. 2009). To be personally responsible for someone else's conduct, the defendant must have known about the conduct and either facilitated, endorsed, or deliberately ignored it.  *Johnson v. Snyder,* 444 F.3d 579, 583-84 (7th Cir. 2006).

Henderson included Hoy as a Defendant based on a "pinball machine" statement Hoy made at a 2012 presentation that was taken completely out of context. Contrary to Henderson's assertion, Hoy never stated the Commission uses COMPAS to give African American inmates a "secret" high score of recidivism to be denied parole. (Dkt. 1 ¶ 3 (Compl.)). This is confirmed by viewing the video of the presentation. (DPFOF ¶ 10.) There is no evidence that Hoy believed COMPAS to be

racially biased or that Hoy was responsible for signing the contract that Corrections entered into with Northpoint in July of 2010. (DPFOF ¶ 12.) Moreover, COMPAS does not use race as a factor in assigning scores, and the tool itself does not even know an offender's race. (DPFOF ¶ 5.) The claim against Hoy should be dismissed for lack of personal involvement.

The claim against Gabler should also be dismissed for lack of personal involvement. Gabler was not on the Parole Commission until March 5, 2017 and therefore had no involvement with the November 18, 2015 Action involving Henderson. (DPFOF ¶ 19.)

## III.    Henderson's equal protection claims fail on their merits because Henderson was not discriminated against based on race.

### A.    Overview of the law

Henderson asserts equal protection claims against the Defendants arising under 42 U.S.C. § 1983. To state a claim for relief under Section 1983, a plaintiff must prove (1) that the conduct complained of was committed by a person acting under color of state law; (2) that this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States; and (3) that the defendants' acts were the proximate cause of the injuries and damages sustained by the plaintiff. *Anderson v. Univ. of Wisc.*, 665 F. Supp. 1372, 1392–93 (W.D. Wis. 1987), *aff'd,* 841 F.2d 737 (7th Cir. 1988).

Prisoners are protected under the Fourteenth Amendment from invidious discrimination based on race. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974.) The Equal

Protection Clause generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985.) "Dissimilar treatment of dissimilarly situated persons" does not violate the Equal Protection Clause. *Klinger v. Dep't of Corr.,* 31 F.3d 727, 731 (8th Cir. 1994) (gender discrimination).

To establish a violation of the equal protection clause, the plaintiff must show that he "is a member of a protected class," that he "is otherwise similarly situated to members of the unprotected class," and that he "was treated differently from members of the unprotected class." *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989) (citations omitted); *see also, McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993) (holding that a § 1983 plaintiff must show she received unfavorable treatment vis-a-vis members of an unprotected class.)

In addition, the plaintiff must demonstrate that the defendant acted with a discriminatory purpose. *Sims v. Mulcahy*, 902 F.2d 524, 538-39 (7th Cir. 1990.) A discriminatory purpose "implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982). Hence, the plaintiff bears the burden of proving, by direct or circumstantial evidence, that discriminatory intent was the motivating factor for the differentiation in treatment. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) ("proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Washington*

*v. Davis,* 426 U.S. 229, 240 (1976). Unfair treatment of the plaintiff is not enough for a discrimination claim. *See Thomas v. Hill*, 963 F. Supp. 753 (N.D. Ind. 1997).

If the plaintiff establishes a prima facie case of racial discrimination, the burden shifts to defendants to prove their actions were not motivated by race. *Washington,* 426 U.S. at 241. Once defendants prove their actions were not motivated by race or religion, "the burden then shifts back to [the] plaintiff to demonstrate that the proffered reason is merely a pretext for discrimination." *Sims v. Mulcahy*, 902 F.2d 524, 539 (1990) (citation omitted.)

In his Complaint, Henderson claims that Hoy, Stensberg, Gabler and Landreman were aware the COMPAS system was biased against African Americans, yet relied on it anyway. In addition, Henderson claims Frey refused to process his parole paperwork because he is African American. There is no factual basis for these claims.

**B. Henderson cannot identify a similarly situated non-African American inmate that was treated differently based on their COMPAS assessment.**

Henderson is a member of a protected class–Henderson is African American. However, Henderson cannot show that (1) he is otherwise similarly situated to members of the unprotected class, and (2) that he was treated differently from members of the unprotected class, which are necessary elements in his equal protection claim. *McMillian*, 878 F.2d at 189.

To meet his burden of showing that another inmate is "similarly situated," an inmate must show that there is someone who is directly comparable in "all material

respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002.) "[A] court must look at all relevant factors, the number of which depends on the context of the case." *Id.* (citation omitted).

To survive summary judgment, Henderson must identify and produce evidence to show that a similarly situated non-African American inmate with the same parole qualifications that he has was granted parole. Henderson cannot meet this burden.

In his Complaint, Henderson identified "white inmates" as having disproportionately lower risk assessment scores. (Dkt. 1 ¶¶ 4, 11, 18 (Compl.)). However, Henderson has not produced any evidence to show that white inmates with parole qualifications similar to his own are being granted parole. Without this evidence, Henderson cannot show that the broad category he refers to as white inmates are directly comparable in all material respects. Therefore, as a group, they are not a proper comparator.

Henderson has failed to identify a single non-African American inmate that was similarly situated and treated differently than he was. Rather, the evidence shows that Henderson is being treated the same as every other inmate when they are eligible for parole review. Therefore, Henderson cannot meet his initial burden of proof and his claims against Hoy, Stensberg, Gabler and Landreman must be dismissed as a matter of law.

**C.     The actions of Defendants Hoy, Stensberg, Gabler and Landreman were not motivated by race**

Even assuming that Henderson is able to make a prima facie showing of discrimination, the November 18, 2015 determination was not motivated by Henderson's race. Henderson's Complaint and Supplemental Pleadings refer to a COMPAS risk assessment score report that was purportedly used by Wisconsin prison officials to deny his parole in 2015. (See Compl., ¶¶ 2, 5, 10-12, 14-15; Suppl. Pldgs., ¶¶ 2, 5, 12.) The essence of Henderson's claims is that Corrections officials either made racially discriminatory decisions or knowingly allowed them to be made. These allegations are baseless.

In Wisconsin, prisoner parole proceedings are conducted by the Commission. The Commission maintains and utilizes criteria for evaluating prisoner eligibility for parole. (DPFOF ¶¶ 14, 17.) None of the listed criteria is COMPAS assessment results.

Henderson was the subject of a Commission Action taken on November 18, 2015. The purpose of the Action was for the Commission to determine whether Henderson qualified for parole based on the applicable criteria. On that date, the Commission determined that Henderson was not eligible for parole. The Commission did not rely on a COMPAS report in reaching their decision. The general reasons for the Commission's action included determinations that: Henderson had not served sufficient time for his punishment; his institutional conduct was not satisfactory; his program participation was not satisfactory; and though he had developed an adequate plan, it was subject to further verification. The Commission further

18

concluded that Henderson's release would involve an unreasonable risk to the public. (DPFOF ¶¶ 18, 23.)

The Commission memorialized the bases of the Action in a written Action Report. COMPAS is not referred to therein. (DPFOF ¶ 23.)

There is simply no nexus or connection between the Action and COMPAS. On August 1, 2014, Henderson was the subject of a COMPAS risk assessment conducted by Corrections. A report from that assessment was generated (the "COMPAS Report"). Henderson's risk assessment was assigned a unique Case Identifier (613865-1). The COMPAS Report was the most recent report created by Corrections for Henderson prior to the Action. (DPFOF ¶ 21.)

The COMPAS Report reflects Overall Risk Potential scores for Henderson. Henderson's Violent Recidivism Risk score was "Low" (1 out of 10), as was his General Recidivism Risk score. (DPFOF ¶ 22.) Thus, even if the Commission had incorporated the COMPAS Report into its analysis, there is nothing in it that reflects Henderson's risk rating was inflated as a result of racial bias.

Simply put, because Henderson's parole denial was not based on the COMPAS Report, Henderson cannot show he was harmed by the alleged racially discriminatory decisions purportedly made or allowed to be made by Defendants Hoy, Stensberg, Gabler and Landreman. Proximate causation is a required element for a Section 1983 claim. *See Anderson*, 665 F. Supp., at 1392-93. Because Henderson cannot demonstrate that the Defendants proximately caused his claimed harm, his claims are fatally defective and should be dismissed as a matter of law.

Moreover, Henderson cannot show that Defendants' utilized COMPAS as a pretext for unlawful discrimination. Because Henderson cannot show that Defendants' actions were pretext for unlawful race discrimination, Defendants are entitled to judgment as a matter of law.

### D.    The actions of Defendant Frey were not motivated by race.

Similarly, Frey's handling of Henderson's parole paperwork was not motivated by Henderson's race. On October 22, 2015, Frey attempted to provide Henderson with a form notifying him that he was scheduled for parole consideration in November 2015 and a release plan for him to complete. Henderson chose not to accept these forms. Frey signed the parole notification form and noted that "Inmate refused to sign." Frey also noted this in Henderson's file the next day. (DPFOF ¶¶ 34-35.)

It is the inmate's choice to accept and complete the parole packet forms. Henderson did not clarify what other forms he wanted when he stated that he did not want any paperwork until he received his parole packet. There was no other information related to parole that Frey could have given him at that time. If Henderson had changed his mind and decided to accept the paperwork, he could have spoken to Frey during her daily rounds on the unit or written an interview/information request to her. (DPFOF ¶¶ 36-38.)

Henderson cannot show that Frey's adherence to the normal procedure for when an inmate refuses to accept their parole paperwork was pretext for unlawful discrimination. Because Henderson cannot show that Frey's actions were pretext for unlawful race discrimination, Frey is entitled to judgment as a matter of law.

Henderson further claims Frey called him a racial slur, which Frey denies. (DPFOF ¶ 42.) However, even if it were true that Frey called Henderson a racial slur, the use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution. *See Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987); *accord Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir.), *clarified on rehearing*, 186 F.3d 633 (5th Cir.1999). Standing alone, verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws. *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir.1987) (per curiam) (Eighth Amendment); *Patton*, 822 F.2d at 700 (due process); *Williams*, 180 F.3d at 705–06 (equal protection); *see generally Shabazz v. Cole*, 69 F.Supp.2d 177, 199–201 (D.Mass.1999) (collecting cases).

## IV.    Defendants are entitled to qualified immunity.

State officials are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established' at the time." *D.C. v. Wesby*, 18 Cal. Daily Op. Serv. 680, 2018 WL 491521, at *10 (U.S. Jan. 22, 2018). The right cannot be defined at a high level of generality, such as a "right to due process." *Sherman v. Four Cty. Counseling Ctr.*, 987 F.2d 397, 406 (7th Cir. 1993) (citation omitted). To be clearly established, the right "must be sufficiently clear that every reasonable official would have understood that what [s]he was doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and brackets omitted). Although qualified immunity is an affirmative defense, the plaintiff has the burden of

demonstrating that the defendant's error was "clearly established." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Henderson cannot meet this burden.

The "clearly established" requirement is a "demanding standard," requiring a plaintiff to show that settled law clearly prohibits a Defendant's particular conduct:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

*Wesby*, 2018 WL 491521, at *10 (internal citations omitted).

While the Supreme Court's case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (internal quotations omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity may be available to a defendant "even if the existence of disputed issues of fact precludes a grant of summary judgment on the merits." *Green v. Carlson*, 826 F.2d 647, 652 n.4 (7th Cir. 1987). Evidence concerning a defendant's

subjective intent is "simply irrelevant." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). Thus, except in extraordinary circumstances, a public official's actual knowledge is irrelevant to the determination of whether there is immunity from suit. *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir. 1984).

To defeat the defense of qualified immunity, Henderson must identify statutes or case law establishing that it was beyond debate that Defendants Hoy, Stensberg, Gabler and Landreman's actions—Advising Corrections on risk assessment programs and using the designated criteria for evaluating prisoner eligibility for parole—and that Defendant Frey's actions—following normal procedures for when an inmate refuses to accept their pre-parole review paperwork—were unlawful. Absent Henderson's identification of controlling case law in place in 2015 when these events occurred, Defendant's are entitled to qualified immunity and dismissal from this lawsuit.

## Conclusion

Defendants respectfully request that their motion for summary judgment be GRANTED, that judgment be entered on their behalf, and that this action against them be dismissed with prejudice.

Dated this 19th day of June 2020.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

**s/Christopher J. McElgunn**
CHRISTOPHER J. MCELGUNN
Assistant Attorney General
State Bar #1092057

**s/Rebecca A. Paulson**
REBECCA A. PAULSON
Assistant Attorney General
State Bar #1079833

Attorneys for State Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6201(McElgunn)
(608) 266-0278 (Paulson)
(608) 267-8906 (Fax)
mcelgunncj@doj.state.wi.us
paulsonra@doj.state.wi.us