IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TITUS HENDERSON,

                              Plaintiff,

        v.                                                    OPINION and ORDER

DEAN STENSBERG, JARED HOY,
STEVE LANDREMAN, DANIEL GABLER,                               18-cv-555-jdp
DAVID WELLS, TIMOTHY BRENNAN,
NORTHPOINTE, INC., and COLLEEN FREY,

                              Defendants.

Plaintiff Titus Henderson, appearing pro se, is incarcerated at Green Bay Correctional Institution. Henderson was denied parole in 2015. He contends that prison officials discriminated against him and other Black prisoners by using a racially biased actuarial tool called "COMPAS" to assess the suitability of prisoners for parole. He brings Fourteenth Amendment equal protection claims against the official conducting his parole hearing, other Department of Corrections officials who served on the parole commission or who helped to implement COMPAS, and the company and its officials who developed COMPAS. Henderson also alleges that a Department of Corrections social worker discriminated against him by refusing to help him with forms used at his parole hearing.

There are two sets of defendants in this case: some are aligned with Northpointe, the company that developed COMPAS; the rest are DOC employees involved in Henderson's parole. Both sets of defendants move for summary judgment. Dkt. 47 and Dkt. 70. I will grant both motions. COMPAS does not explicitly consider race, but there is growing concern that risk-assessment algorithms unfairly disadvantage Black offenders. But that concern is not material to this case. Henderson's recidivism score in the COMPAS assessment was favorable;

he has failed to adduce admissible evidence that he was harmed by his COMPAS assessment or that he was denied parole for a discriminatory reason.

PRELIMINARY MATTERS

I begin with several preliminary motions.

**A.  Motion to appoint counsel and expert**

Henderson has filed a motion asking for the court to appoint him counsel, contending that the case is too complex for him because of his lack of education and legal training, and because he believes that the merits of his case will depend on expert testimony about the inner workings of the COMPAS system. Dkt. 69. He also asks the court to appoint an expert under Federal Rule of Evidence 706 to assist the court with complex statistical issues. *Id.*

Litigants in civil cases do not have a constitutional right to counsel, and I do not have the authority to appoint counsel to represent a pro se plaintiff in a civil matter. I can only assist in recruiting counsel who may be willing to serve voluntarily. *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007) (en banc). So I will construe Henderson's motion as a motion for assistance in recruiting counsel.

To show that it is appropriate for the court to assist in recruiting counsel, a plaintiff must first show that he has made reasonable efforts to locate an attorney on his own. *Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). To meet this requirement, this court generally requires plaintiffs to submit letters from at least three attorneys to whom they have written and who have refused to take the case. Henderson says that he wrote to several lawyers none of whom have agreed to represent him, so he has met this requirement.

2

The number of pro se litigants seeking assistance in recruiting counsel is far greater than the number of attorneys who are willing to take on such cases. So this court will assist in recruiting counsel only if a pro se litigant demonstrates that his is one of those relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds his ability to prosecute it. *Pruitt*, 503 F.3d at 654–55. The court must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

Henderson's lack of education or legal training is common among pro se litigants and I have not seen evidence that he is more limited than the typical pro se litigant. To the contrary, Henderson is an experienced pro se litigator in this court and has proven capable of performing the tasks needed to effectively represent himself. As for his assertion that the case is too difficult for him because of complex statistical issues, my analysis below shows that the case ultimately doesn't boil down to an analysis of the inner workings of the COMPAS algorithm. Instead, the undisputed evidence shows that the COMPAS assessment used in Henderson's parole hearing was favorable to him and could not have been the reason he was denied parole. So I will deny his motion for the court's assistance in recruiting him counsel. Similar reasoning applies to his motion for court-appointed expert, so I'll deny that motion too.

## B.  Motions to stay summary judgment ruling and for default judgment

Along with his materials opposing the state defendants' motion for summary judgment, Henderson asks the court to stay its decision on summary judgment until defendants turn over discovery material and because counsel for the state defendants ordered his materials confiscated. Dkt. 94. He does not explain what counsel ordered to be confiscated, nor does he

3

suggest that there are specific items missing from his summary judgment materials. I take Henderson to be saying that he could prove that COMPAS is biased against Black prisoners if he had access to information about the inner workings of the program. The Northpointe defendants have objected to Henderson's discovery requests for their COMPAS algorithm and related materials, saying that those materials are trade secrets. *See* Dkt. 95-7. But Henderson didn't file a motion to compel discovery until months after summary judgment briefing was completed, Dkt. 106, which is far too late to properly challenge the withholding of discovery materials for purposes of summary judgment. Similarly, Henderson waited until summary judgment briefing was complete to file a motion for default judgment that he says is based on defendants' destruction of evidence. Dkt. 103. But Henderson doesn't identify evidence that has been destroyed; instead he argues that defendants have improperly withheld discovery about COMPAS and its effect on parole determinations.

But this case doesn't turn on the details of the COMPAS algorithm. So Henderson's discovery-related motions, in addition to being too late to affect the summary judgment proceedings, are immaterial to the outcome of the case. I'll deny his motions to stay a decision on the summary judgment motions and for default judgment. Because this order results in dismissal of the case, I'll deny his motion to compel discovery as moot.

## C. Motions for preliminary injunctive relief

Henderson has filed two motions for preliminary injunctive relief, Dkt. 60 and Dkt. 76, that I will deny for the same reasons that I will grant summary judgment to defendants on his underlying claims: no reasonable jury could find in his favor on his claims.

**D. Summary judgment briefing**

Henderson has filed a sur-reply opposing the Northpointe defendants' motion for summary judgment. Dkt. 66. The Northpointe defendants have filed a sur-sur-reply. Dkt. 68. I will consider both of those filings.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Plaintiff Titus Henderson is currently incarcerated at Green Bay Correctional Institution.

Defendants Jared Hoy, Dean Stensberg, Steven Landreman, Daniel Gabler, and Colleen Frey each worked for the Wisconsin Department of Corrections (DOC). Hoy was a policy initiatives advisor on the selection committee that reviewed proposals from various risk-assessment programs and that ultimately chose COMPAS (Correctional Offender Management Profiling for Alternative Sanctions). Stensberg was the chairman of the state parole commission. Landreman and Gabler were parole commission members. Frey was a social worker.

The DOC licenses COMPAS software from defendant Northpointe, Inc. Henderson says that defendants Timothy Brennan and David Wells own Northpointe and developed COMPAS.

COMPAS software can be used as a risk-assessment tool to evaluate a prisoner's potential likelihood of recidivism. *Id.* The state defendants say that COMPAS does not use race as a factor in its proprietary risk-assessment calculation, and that the program itself does not even know an offender's race. Henderson notes that COMPAS risk-assessment documents

5

include the offender's race along with other identifying information like his DOC inmate number, but he doesn't provide any evidence showing that race is specifically included in the COMPAS algorithm calculating recidivism risk.

The state parole commission maintains criteria for evaluating prisoner eligibility for parole, including whether the inmate has (1) reached their parole eligibility date; (2) served enough time for punishment so as not to depreciate the severity of an offense; (3) maintained positive institutional adjustment; (4) completed assessed program needs with maximum benefit achieved; (5) completed and submitted a workable parole plan offering the inmate a realistic opportunity for a stable residence, employment, and programming; and (6) reduced the level of risk to the public by release.

On August 1, 2014, Henderson was the subject of a COMPAS risk assessment. The report generated the lowest possible recidivism risk scores: a 1 (on a scale of 10) for both "Violent Recidivism Risk" and "General Recidivism Risk." Dkt. 54.[1] Henderson attempts to dispute that the report produced by defendants is the one actually used in his 2015 parole hearing. (As explained in the analysis section, Henderson doesn't raise a *genuine* dispute, because he hasn't adduced any admissible evidence to support his contentions about the report.)

Henderson was assigned to defendant Frey's social work caseload at the time of his 2015 parole hearing. Henderson had a parole review scheduled for November 2015. As Henderson's assigned social worker at the time, Frey was responsible for giving him a "Notice

---

[1] The report also listed various factors under the "Criminogenic Need Scales," with Henderson receiving scores of 10 for "current violence" and "prison misconduct." But Henderson's claims are about the recidivism risk scores and he doesn't develop an argument about his criminogenic need ratings.

6

of Parole Commission Consideration" form to help him prepare for the hearing and a "Release Plan Information" form for him to explain his plans for obtaining a residence, employment, finances, transportation, health care, and treatment services upon release.

On October 22, 2015, Frey met with Henderson about his upcoming parole hearing. What happened during the meeting is disputed. According to Frey, Henderson would not accept the forms, and Frey signed them with the notation "Inmate refused to sign." Dkt. 74-1, at 2. Henderson had later opportunities to speak to Frey or he could have written to her, but he did not.

Henderson gives a much different account of the meeting with Frey. Henderson says that they got into an argument over how a social worker should help an inmate prepare for a parole review. Frey then said, "Listen nigger, you don't tell me how to do my job." Dkt. 93, at 4, ¶ 19. Henderson told Frey to get him a parole packet. As Frey walked away, she said, "I'm not bringing nothing, demanding nigger." *Id.*, ¶ 21. Frey returned several days later with a stack of documents. She told Henderson, "[Y]our COMPAS Scores are highest at 10 across the board because of your bad conduct and continued administrative confinement from 2003–2015." *Id.* at 4–5, ¶ 24. Henderson told Frey that she still was giving him only part of the parole plan. Frey responded, "There is no parole plan because COMPAS is directing Parole Bd. to deny you parole based on your high scores." *Id.* at 5, ¶ 26. She also told him, "Don't tell me how to do my dam[n] job. I'll just lie and say you refused to sign your parole notice and you didn't want your papers." *Id.*, ¶ 28. Henderson also says that Frey treated a white inmate better than him: she properly gave the white inmate his paperwork before that inmate's hearing.

Frey completed the social-worker-statement portion of Henderson's release plan before the hearing, noting that he was incarcerated for first-degree reckless homicide, three counts of

7

first-degree recklessly endangering safety, and battery by a prisoner. Over the previous 20 years in prison he had received 70 conduct reports, 55 of those for major rule violations. Frey also stated that Henderson had refused to complete his release form, and that he had completed a COMPAS assessment in August 2014, "scoring low in all areas." Dkt. 74-1, at 6.

Defendant Landreman conducted Henderson's parole hearing on November 18, 2015. Henderson says that Landreman recorded the hearing but neither side has produced the recording, so what was said during the hearing is disputed. According to Henderson, Landreman said, "I've reviewed your social service file and COMPAS report and I find that you're not eligible for parole release at this time." Dkt. 93, at 6, ¶ 33. Henderson says that he asked Landreman, "You [are] denying my parole based on COMPAS reports?" *Id.*, ¶ 34. Landreman said, "We use COMPAS report in your files to determine your release." *Id.*, ¶ 35. Landreman added, "Your COMPAS scores I'm looking at are 10s." *Id.*, ¶ 36.

Defendants deny that Landreman made these statements. They also say that Henderson's COMPAS scores weren't used in the parole determination. They say that Henderson was denied parole for reasons listed in the commission's "Parole Commission Action" report (they refer to it as an "action report"), which appears to be authored by Landreman. Dkt. 49-2.

The section of the action report titled "General Reasons for Action Taken" listed the following reasons for denying Henderson parole: Henderson had not served sufficient time for punishment; his institutional conduct was not satisfactory; his program participation was not satisfactory; although he had developed an adequate release plan, it was subject to further verification; and release would involve an unreasonable risk to the public. *Id.* at 2. The action report included a "Commission Comments" section describing details of Henderson's homicide

8

conviction, his "extremely poor/assaultive behavior, primarily between 2002 to present," his continuing placement in administrative confinement, and his need to complete programming upon release to general population. The report also noted that, despite the lack of a formal release plan, at some point Henderson had presented a plan to live with a friend in Minnesota upon release, and that the plan "may be workable," but would need additional approval. It is unclear where Landreman learned this information, but I infer that it was either from Henderson at the hearing or from some part of the record that is not on the docket in this case.

In his materials, Henderson also discusses a November 2018 parole denial, but he does not bring claims about that denial.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I allowed Henderson to proceed with the following claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution:

- Defendant DOC employees Jared Hoy, Dean Stensberg, Daniel Gabler, and Steve Landreman supported using COMPAS for parole decisions despite knowing that the program is biased against Black offenders, and they won't pay Northpointe for the corrective upgrade.

- COMPAS was created by defendants David Wells, Timothy Brennan, and Northpointe Inc., who are aware of the program's racial bias. Northpointe won't upgrade the program for the DOC to make it more accurate without being paid to do so.

- Defendant Frey refused to process Henderson's parole documents, calling him a racial slur.

### A.  COMPAS and its use in parole decisions

I'll start with Henderson's first two sets of claims, both relating to his allegations that the COMPAS program is biased against Black prisoners and that the use of COMPAS in parole decisions led to what he calls a "predetermined" denial of parole for him in his 2015 hearing.

To succeed on a claim for discrimination under the Equal Protection Clause, Henderson must show that (1) he is a member of a protected class; (2) he was similarly situated to members of the unprotected class; (3) and he was treated differently from members of the unprotected class. *See Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Henderson must also produce evidence of discriminatory intent—that is, evidence that defendants "selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (citation and quotation marks omitted).

Both sets of defendants contend that Henderson cannot succeed on his claims because he's incorrect about an assumption underlying his claims: defendants say that it's undisputed that the DOC didn't use COMPAS in its parole decision. But this fact is sharply and genuinely disputed. The state defendants responded to Henderson's interrogatories by stating that they do use COMPAS assessments in parole hearings generally. More specifically, they say, "Generally speaking, the Parole Commission reviews the 'Violent Recidivism Risk' and 'General Recidivism Risk' scores in the Northpointe Suite (COMPAS) database" and "COMPAS assessment/results are simply used as another piece of information in the overall review process when considering inmates for parole." Dkt. 66-1, at 3, ¶ 8, and at 9, ¶ 16. Defendant Frey's "release plan information" report used in the hearing refers to the Henderson's COMPAS assessment. And Henderson says that Landreman stated at the hearing

10

that he reviewed the COMPAS assessment and that the commission uses COMPAS assessments in its decisions.

As for whether COMPAS is biased against Black inmates and whether defendants knew this was the case, Henderson submits a series of articles from journalists at ProPublica stating that their analysis of COMPAS assessments and the subsequent criminal records for those assessed showed that COMPAS was (1) more likely to give high recidivism risk scores to Black inmates who didn't end up reoffending; and (2) more likely to give low recidivism risk scores to white inmates who did reoffend. *See* attachments to Dkt. 67.[2] Henderson also says that the Wisconsin Supreme Court, in a case discussing these articles and social science research on COMPAS, concluded that "race is a determining factor in COMPAS scores." Dkt. 91, at 12 (citing *State v. Loomis*, 2016 WI 68, 371 Wis. 2d 235, 881 N.W.2d 749). I previously discussed *Loomis* in denying a motion to dismiss by the Northpointe defendants. *See* Dkt. 45, at 4. I noted that *Loomis* wasn't an equal protection case—it was a due process case about sentencing—and that nothing in *Loomis* foreclosed Henderson's equal protection claims. *Id.* But Henderson is incorrect about what *Loomis* says. The court did not conclude that race is a determining factor in COMPAS assessments; it said that studies "raise concerns regarding how a COMPAS assessment's risk factors correlate with race" and it concluded that presentence reports relying on COMPAS assessments should include, among other warnings, a warning that "some studies of COMPAS risk-assessment scores have raised questions about whether they

---

[2] These articles are also available online. Julia Angwin et al., *Machine Bias*, ProPublica (May 23, 2016), https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing; Jeff Larson et al., *How We Analyzed the COMPAS Recidivism Algorithm*, ProPublica (May 23, 2016), https://www.propublica.org/article/how-we-analyzed-the-compas-recidivism-algorithm; Jeff Larson and Julia Angwin, *Technical Response to Northpointe*, ProPublica (July 29, 2016), https://www.propublica.org/article/technical-response-to-northpointe.

disproportionately classify minority offenders as having a higher risk of recidivism." 2016 WI 68, ¶¶ 63, 66.

The takeaway from these materials is that there is some research showing that COMPAS disproportionately grades Black offenders as having a higher risk of recidivism; other research disagrees.

Henderson wants to develop evidence to support his side of this dispute. He says that he has retained the ProPublica authors and a professor of data policy to testify as experts about the discriminatory effects of the COMPAS algorithm. *See* Dkt 77. Defendants move to strike those expert disclosures as untimely (Henderson filed them more than two months after his deadline) and for failing to comply with Federal Rule of Civil Procedure 26(a)(2)(B) because Henderson doesn't include written expert reports. Dkt. 79. Henderson counters that the state defendants' own expert disclosures of non-retained experts—all of whom are defendants—do not disclose a summary of those proposed witnesses' facts and opinions to which they are expected to testify, as required under Rule 26(a)(2)(C).

Ultimately, the disputed research on racial bias in COMPAS is immaterial for two reasons. First, some research suggests that COMPAS has a disparate impact on Black offenders, but it does not directly support a claim of intentional race discrimination, which is what Henderson must show here. Second, and more important to this case, Henderson fails to present evidence showing that his COMPAS assessment worked against him in the parole hearing. Henderson's COMPAS recidivism score was the lowest possible, so he cannot show that his COMPAS recidivism score was the reason he was denied parole. Both sides' objections to the other's experts will be denied as moot.

But that's not quite the end of the matter because Henderson says the 2014 COMPAS report was not the one actually used at his parole hearing. The Northpointe defendants previously submitted Henderson's 2014 COMPAS assessment in connection with their motion to dismiss. The 2014 COMPAS assessment gave Henderson the lowest possible risk assessment: a score of 1 for both "Violent Recidivism Risk" and "General Recidivism Risk." *See* Dkt. 28, Dkt. 31. The Northpointe defendants sent Henderson a copy of the assessment and then asked the court to seal the document, which it did. Dkt. 30–32. I denied the motion to dismiss because it wasn't clear from the pleadings that the document that the Northpointe defendants submitted was the same risk assessment used in Henderson's parole decision. Dkt. 45, at 4–5. I converted the motion to dismiss into a motion for summary judgment. *Id.* at 5. The Northpointe defendants followed with a new motion for summary judgment, again submitting a copy of the 2014 assessment, which the court sealed. Dkt. 47; Dkt. 54–56.

But it appears that the Northpointe defendants did not send the new copy of this assessment to Henderson. Henderson has filed a motion to strike the version of the document he received as fabricated, and for sanctions against defendants: he theorizes that the two versions on the docket must be different, saying, "Why submit one COMPAS report ([Dkt. 31]) to Plaintiff; then a different "secret" redacted COMPAS report ([Dkt. 49-1 and Dkt. 54]) to support summary judgment?" Dkt. 84, at 2. And he says that counsel should be recruited for him to obtain the second document that has been sealed from his view. I'll deny Henderson's motion to strike or for counsel because the second docketed copy of the 2014 assessment is identical to the first copy, which he has.

Henderson says that he has other evidence that the 2014 assessment is fabricated, or at least was not the version used at his 2015 parole hearing. The 2014 assessment includes a box

labeled "screener," with "Harper, Melanie S." filled in the box. Dkt. 54, at 2. Henderson says that he has never met Melanie Harper and that his COMPAS interview was conducted by someone else, a social worker named Mrs. Mink. He submits a memo from Mink regarding the assessment that confirms that Mink carried out the interview. Dkt. 59-1. Henderson assumes that the "screener" box was meant to identify the person who *conducted* the interview, but he doesn't explain why he thinks this is the case. His speculation that the assessment is fabricated because Harper's name rather than Mink's appears on the assessment is not enough to raise a reasonable inference that the document is something other than what defendants say it is. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

Henderson also recounts having a conversation with Green Bay Correctional Institution social worker Chris Heil in which he says that Heil stated the following:

- "Yes, I'll tell the court that Dkt. #31 is a false COMPAS report not used by DOC nor Parole Bd." Dkt. 59, at 4, ¶ 20.

- "The COMPAS score in [Dkt. 31][3] is a 2019 score that has been reduced to the lowest recidivism score every year to reflect that you have not been released since '95." Dkt. 93, at 2, ¶ 7.

- "The 2019 COMPAS score is not the COMPAS score[] from 2014 in [Dkt. 31] because the [unintelligible] version of COMPAS automatically reduce[s] scores every six (6) to nine (9) months, based on additional information." *Id.*, ¶ 8.

---

[3] Henderson quotes Heil as referring to Dkt. 49-1, which is a completely redacted public version of the assessment docketed by the Northpointe defendants. I will assume that Henderson means the unredacted copy of the document that he was given, Dkt. 31.

14

If Heil had submitted these statements in a declaration or affidavit, I could consider them. But, as the Northpointe defendants point out, I can't consider Henderson's recounting of Heil's out-of-court statements because they are hearsay. Henderson also attaches a document that he says is a COMPAS report from an assessment completed by him and Heil in 2020. Dkt. 59-2. This document is titled "Case Plan (Person Version)" and includes attached documents pertaining to his 2020 parole determination, but nothing in the case plan itself or the attached documents contains COMPAS risk evaluations. It does not support any of Henderson's challenges to the authenticity of the 2014 report provided by the Northpointe defendants.

I also take Henderson to be saying that the 2014 report with low recidivism ratings cannot be the assessment used at his hearing because both Frey and Landreman told him that COMPAS graded him at a very high risk of re-offense. Henderson says that Frey told him, "[Y]our COMPAS Scores are highest at 10 across the board because of your bad conduct and continued administrative confinement from 2003–2015" and "[t]here is no parole plan because COMPAS is directing Parole Bd. to deny you parole based on your high scores." Landreman told him, "Your COMPAS scores I'm looking at are 10s." *Id.*, ¶ 36.

These statements are not hearsay; they are statements made by a party opponent. Fed. R. Evid. 801(d)(2). But there's another problem with them: Federal Rule of Evidence 1002 precludes Henderson from eliciting testimony about the contents of a document. Rule 1002 states, "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."[4] In short, Henderson can't just tell

---

[4] The two copies of the 2014 COMPAS report are not the original document, but Federal Rule of Evidence 1003 states that duplicates are admissible "to the same extent as the original unless

the court what the report said—or in this case, tell the court what Landreman says the report said. He is required to *show* what the report says by producing a copy. Henderson hasn't presented any evidence to create a genuine dispute whether the 2014 report was authentic and actually used at his hearing. I will rely on the 2014 report in considering Henderson's equal protection claims.

Given that the COMPAS report gave Henderson the lowest possible recidivism risk scores, no reasonable jury could conclude that racial bias in the COMPAS recidivism risk scores caused him to be denied parole. Rather, the only reasonable inference is that the commission based its decision on information in its report, including the severity of Henderson's offense, his convictions for battery by a prisoner, his "extremely poor/assaultive behavior, particularly from 2002 to present," his continued placement in administrative confinement, and his need to complete programming. The commission did conclude that "[r]elease at this time would involve an unreasonable risk to the public," but given the low COMPAS recidivism risk scores, the only reasonable inference is that the commission drew that conclusion *despite* the COMPAS scores.

Because Henderson fails to raise a reasonable inference that racial bias in the COMPAS recidivism risk scores caused him to be denied parole, I will grant summary judgment to defendants on all of Henderson's claims against the Northpointe defendants, against the DOC officials involved in the implementation of COMPAS, and against Landreman.

---

a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Henderson does not raise a genuine dispute about the COMPAS report's authenticity.

## B.  Defendant Frey

That leaves defendant Frey. Henderson contends that Frey refused to give him his release plan form because of racial animus. The parties dispute what was said in their meeting about the plan. Frey says that Henderson refused to complete it. Henderson says that Frey wouldn't give him the plan and then called him racial slurs. Henderson's version of Frey's statements isn't hearsay because the statements are by a party opponent. Given the slurs that Henderson says that Frey directed at him, he's provided enough evidence to create a genuine dispute of fact over whether Frey refused give him the release plan because of racial animus.

But the dispute is not material. I will grant the state defendants' motion for summary judgment on this claim because Henderson fails to establish that he was harmed by Frey's actions. To succeed on a constitutional claim brought under 42 U.S.C. § 1983, a plaintiff must identify evidence that defendants' actions caused him to be injured. *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). The commission's action report noted that Henderson had presented a plan to live with a friend in Minnesota upon release, and the "general reasons for action taken" part of the action report that Henderson had "developed an adequate plan" that would need an agent's verification. Dkt. 49-2, at 2. There's nothing in the record to show that the lack of a formal filled-out release plan had anything to do with the denial of parole. The slurs allegedly directed at Henderson are repugnant, but without a showing of harm, Henderson cannot succeed on his equal protection claim against Frey.[5]

---

[5] The state defendants also contend that they are entitled to qualified immunity on Henderson's claims. Because I am dismissing Henderson's claims on the merits, I need not consider defendants' qualified immunity argument.

17

ORDER

IT IS ORDERED that:

1.  Plaintiff Titus Henderson's motion for the court's assistance in recruiting him counsel and for the court to appoint an expert, Dkt. 69, is DENIED.

2.  Plaintiff's motion to stay a decision on summary judgment, Dkt. 94, is DENIED.

3.  Plaintiff's motion to compel discovery, Dkt. 106, is DENIED as moot.

4.  Plaintiff's motions for preliminary injunctive relief, Dkt. 60 and Dkt. 76, are DENIED.

5.  Defendants' joint motion to strike plaintiff's expert disclosures, Dkt. 79, is DENIED as moot.

6.  Plaintiff's motion to strike, for sanctions against defendants, and for recruitment of counsel, Dkt. 80, is DENIED.

7.  Plaintiff's motion for default judgment, Dkt. 103, is DENIED.

8.  Defendants' motions for summary judgment, Dkt. 47 and Dkt. 70, are GRANTED.

9.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 26, 2021.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

18